## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DARLA OPPER, On Behalf of Herself and All Others Similarly Situated,<br>  Plaintiff,<br>  vs.<br>DELTA AIRLINES, INC.,<br>  Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Darla Opper ("Plaintiff"), on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to all other allegations.

## INTRODUCTION

1. Plaintiff brings this action against Defendant, Delta Airlines, Inc. ("Delta" or "Defendant"), arising from its failure to abide by its express "BEST FARE GUARANTEE" promise to consumers who book flights on delta.com.

2. On flight routings that feature a connecting city, Delta does not always provide travelers with the lowest available fare class and corresponding fare, even though such fare classes are verifiably available for each segment of a journey, according to Delta's own data. Delta, therefore, extracts higher fares for the exact same seats on the exact same flights—despite its express promise of a "BEST FARE" for consumers on its website.

3. Delta employs sophisticated software to artificially "marry" segments of a journey with a connecting flight, preventing consumers from accessing lower fare classes that Delta makes available on each segment of the same journey. If, for example, a consumer wants to travel from Washington to Los Angeles and that route features a connection in Atlanta, Delta

will prohibit consumers from accessing lower fare classes for the Washington-Atlanta and for the Atlanta-Los Angeles flight, even when those lower fare classes are verifiably available on both segments at the very same time, for other travelers.

4.     Indeed, if Delta's reservations system didn't "marry" the connecting segments, a consumer would be able to book the lower fare classes with corresponding lower fares that are truly available on those flights, and thereby avail herself of a lower ticket price.  Notwithstanding Delta's "BEST FARE GUARANTEE," its segment-marrying scheme can result in consumers paying hundreds of dollars more *for the exact same seats on the exact same flights*.

5.     Upon information and belief, Delta's segment-marrying scheme was adopted within the last several years, and represents a concerted effort to manipulate inventory of available seats in particular fare classes, but only for certain consumers.  Delta tells one group of consumers that certain low-fare class seats are available on certain flights, while at the same time it conceals those same available seats from other consumers.

6.     Thus, Delta does not, in fact, provide its "BEST FARE" on certain tickets, often charging a price based on a fare class significantly higher than what is actually available—which can correspond to a price as high as double or triple that which is truly available.

7.     Far from providing the "BEST FARE," Delta holds back and conceals access to its "best" available fare classes and corresponding fares—even though it makes such fare classes available to other travelers.

## JURISDICTION AND VENUE

8.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of

interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than Delta.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Delta is subject to personal jurisdiction here and regularly conducts business in the Eastern District of Wisconsin, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## PARTIES

10.    Plaintiff is a citizen of the State of Wisconsin. Plaintiff made her flight booking on delta.com from her home residence in Wittenberg, Wisconsin.

11.    Delta is a major American air carrier that offers service to 333 destinations in 64 countries. Delta's corporate offices and headquarters are located at 1030 Delta Blvd., Atlanta, Georgia. Thus, Delta is a citizen of the State of Georgia.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.    Delta's "Best Fare Guarantee"

12.    Throughout the putative class period, and continuing to the present, Delta makes several prominent representations on its website, and throughout the booking process, that it is providing its users with a "BEST FARE GUARANTEE."

13.    Delta repeatedly states on its home page and elsewhere that "With our Best Fare Guarantee, you get the best Delta fares or your money back."

14.    Defendant's "BEST FARE GUARANTEE" is an express promise and warranty that Delta is providing its customers with the lowest available fares classes and corresponding fares for a given routing when they book on delta.com.

### B.    Airline Ticket Prices are the Product of Fare Classes and Availability

15.    Airline fares are the direct product of fare classes designated by airlines.

3

16.     For any given flight, airlines such as Delta use various letter-based fare classes to categorize seats available for sale.  And each fare class carries with it a unique corresponding fare.

17.     Delta has the following Economy fare classes, beginning with the most expensive and ending with the least expensive: Y, B, M, S, H, Q, K, L, U, T, X, V and E.

18.     Each fare class carries with it different restrictions and/or requirements, such as permitted days of the week, advance-purchase requirements, blackout dates, minimum and maximum stay, penalties for changes and cancellations, etc. Higher fare classes generally have fewer restrictions than lower fare classes, and the highest fare classes usually carry no restrictions.

19.     For example, a flight from Chicago to Miami would have a handful of seats for sale in each fare class.  The exact mix of seats made available in each fare class is in Delta's sole discretion, as are the restrictions and/or requirements that come with each fare class.

20.     Delta allocates available seats on a given flight between the various fare classes.

21.     For example, Delta sets a certain number of "E" fares (the least expensive fare) for a given flight.   When consumers buy up the lowest-fare class seats, later-purchasing consumers are forced to buy more expensive fare class seats.   In general, once consumers purchase all the available "E" fares, consumers will be forced to purchase the next highest fare class ("V").

22.     An airline "tariff" is a list of published fares between any two cities.  (Domestic U.S. fares are the same regardless of the direction of travel—that is, a carrier's tariff from Washington to Denver, for example, is identical to its tariff from Denver to Washington.)

4

23.     A "tariff" contains the base fare in dollars, which is inclusive of a 7.5% excise tax, but it excludes other taxes, surcharges or fees.  A base fare published on a tariff on any given day means that a ticket at that price can be purchased and issued on that day for future travel, provided there is available seat inventory in that same fare class on the particular flights.

24.     Prices vary for a trip between any two cities based on available fare class.  In other words, there exists one or more prices for seats booked in each fare class (Y, B, M, S, H, Q, K, L, U, T, X, V and E).  Generally, the lower the fare class, the lower the price.

25.     Delta, utilizing its sole discretion, sets each fare, which corresponds directly to each fare class, for each city pair.

26.     This fare class and tariff data is published by Delta to airline agents and users of any Global Distribution System ("GDS").  Certain publicly available websites make GDS data available for a fee, including expertflyer.com.

27.     For any given flight, Delta has the unilateral ability to set the number of seats for any given fare class.

28.     Defendant also has the unilateral ability to set the corresponding fare for each city pair, based on fare class.

29.     Plaintiff challenges none of the foregoing practices.

**C.     Delta Does Not Provide Lowest Available Fare Classes for Connecting Flights**

30.     The practice Plaintiff challenges by way of this lawsuit arises with flights that feature a "connection" between the origin and the destination.

31.     Each leg of a journey with a connection has a distinct mix of fare classes and availability associated with it, in the manner discussed above.

5

32.     For example, on a flight from New York to San Francisco, with a connection in Atlanta, each leg has a distinct mix of fare class and availability.  One leg may have availability in a lower fare class than another leg may have, or they may both have identical fare class availability.

33.     On certain routes, Delta does not provide its consumers with the lowest available fare class for each leg of the trip, nor does it even provide consumers with the lowest fare class <u>in common</u> between both legs of the trip.  Rather, when "marrying" segments, Delta refuses to provide the lower fare classes and corresponding fares available on one or both segments, forcing consumers to book tickets in higher fare classes with higher corresponding prices.

34.     Indeed, without disclaiming or clarifying its "BEST FARE GUARANTEE," Delta provides its best fare class availability and corresponding best fares *only* for non-stop journeys.  For non-stop journeys, Delta actually does offer delta.com visitors the lowest available fare class and corresponding fare.  But for flights with connecting cities, Delta manipulates fare class inventory to prohibit users from accessing its best available fare classes and corresponding fares.

35.     The scheme is part of a concerted effort to extract higher revenue from certain consumers, as discussed below, in contravention of Delta's specific "BEST FARE GUARANTEE" representations to consumers.

D.     <u>An Industry Consultant Publicly Announces Software Designed to Effectuate the Scheme</u>

36.     In March, 2010, the airline industry GDS, Amadeus, which hosts travel reservations systems, issued a press release announcing the launch of a new "revenue maximization solution" called "Active Valuation."

37. According to the release, "Active Valuation" is "a new IT solution that enables airlines to maximize revenues across multiple channels…'Active Valuation' works by enabling the application of sophisticated business logic to *dynamically adjust the yield (revenue expected) of an airline product, according to the context in which a booking is made.* These yield modifiers are used in a seamless manner in order to perform an origin and destination (O&D) calculation. *This allows a dynamic segmentation of customers, taking into consideration their characteristics, the point-of-sale used and any connecting flight data, in order to better capture their willingness-to-pay*" (emphasis added).

38. Further, "[t]he new solution is designed to complement Amadeus' existing 'Revenue Availability' solution which has already been implemented by more than 10 airlines worldwide…'Revenue Availability' works by allowing an airline to intelligently optimize its inventory in order to generate maximum return on a booking. For example, *when a customer requests availability information for a multi-leg journey, the solution automatically considers the complete value of the trip and delivers appropriate availability information to the customer*."

39. In plain words, on a trip from Washington to Los Angeles that includes a connecting city, the software will "marry up" the two separate flights that make up the trip. Even if both of the flight legs verifiably have seats available in the lowest fare class (and Delta makes those seats available to other consumers), the software will prevent the consumer from accessing that fare class, and will instead force a consumer to pay for a higher fare class for the trip.

40. Upon information and belief, Delta uses a variation of the Amadeus software, to "maximize" revenue on connecting city flights in a manner that is contrary to its express representations to consumers that they will receive the "BEST FARES" available.

### E. Counsel's Tests of Delta Booking Systems Reveal the Extent of the Problem

41. Use of third-party fare reporting systems reveals the extent of the problem.

42. Websites such as expertflyer.com and flightstats.com allow specialized users to review fare class availability for given flights in real time.

43. In November, 2012, Plaintiff's counsel compared, in real time, prices and fare classes made available to consumers on delta.com, with Delta's true inventory—as revealed by Delta's own voluntary GDS reporting, and as displayed on expertflyer.com.

44. Counsel performed real-time tests of Delta's booking procedures. Those tests revealed that, on tested routes, Delta systematically withheld available seats in lower fare classes, thus substantially increasing consumers' prices for journeys with connecting flights. Delta did this even when its *own system* showed availability in lower fare classes for *all segments of the journey*.

45. For example, on November 30, 2012, counsel attempted to book a one-way trip from New Orleans' Louis Armstrong Airport (MSY) to Seattle-Tacoma Airport (SEA) on March 9, 2013, with a connection in Salt Lake City (SLC).

46. As it does currently, Delta prominently displayed its BEST FARE guarantee on its website. *See, e.g*., Exhibit A.

47. Real-time availability on expertflyer.com revealed that for Flight DL 1889, from MSY to SLC, available seats existed in fare class "T"—the second to lowest fare class at the time. *See* Exhibit B. Real-time availability on expertflyer.com and on delta.com also revealed that for Flight DL 2157, from SLC to SEA, available seats existed in fare class "T"—again, the second to lowest fare class. *See* Exhibit C.

8

48.     That means Delta's own publicly reported data indicated that available seats existed on both legs of the flight in fare class "T."

49.     But when counsel attempted, at the same time, to book the same one-way flight from New Orleans' Louis Armstrong Airport (MSY) to Seattle-Tacoma Airport (SEA) on March 9, 2013, with a connection in Salt Lake City (SLC) on delta.com, Delta only offered seats for both flights in "H" fare class—a full *five classes higher* than the lowest fare class seats actually available on both flights.  *See* Exhibit D.

50.     Published tariff information reveals that the price for a "K" fare class ticket from MSY through to SEA (with the same connection in SLC) was just $259.  (A "K" fare class is a "higher" fare class than the "T" fare class that was actually available, but Delta did not publish a "T" fare class for this route).

51.     But Delta.com booked the trip only in "H" fare class, which corresponded to a $433 base fare—at full $174 more than the "K" fare class tariff, in which Delta's own data showed seats were available for each of the connecting flights.

52.     Delta's own website betrays the "marrying" scheme as well.  As reproduced in Exhibit G, counsel performed a "multi-city" search on delta.com for a trip between Appleton and Sarasota on March 28, 2015.

53.     A "multi-city" search allows users to search for flights segment by segment, while keeping all flights on the same ticket. The reasons for using this type of search include, but are not limited to, the ability to specify a particular routing or to arrive in one city and depart from another.

54.     According to the Delta tariff, the lowest published one-way fare class was "U." Based on that data, counsel requested "U or higher" fare in the multi-city search.

55.     For the first segment, from Appleton to Atlanta, delta.com displayed a "U" fare class—indicating availability in that fare class.

56.     For the next segment, Atlanta to Sarasota, delta.com also displayed a "U" fare class as well—also indicating availability in that fare class.

57.     But, at the very last minute, right at the moment the website would have priced the trip, delta.com refused to display a price and refused to sell the available "U" fare class seats. Instead, it repeatedly displayed an error message.

58.     Instead, Delta "married" the segments and only allowed a user to purchase the trip in the "S" fare class.

59.     In short, Exhibit G indicates that Delta's own system displayed availability in the "U" fare class, but at the very last minute prohibited a purchaser from accessing it.

60.     GDS data indicated that a "U" fare class seat was priced at $256, but delta.com would only allow a user access to the "S" fare class, which cost $470.

61.     This last-minute switch—which barred access to verifiably available seats in "U" fare class—was performed by Delta's sophisticated software, and is not consistent with Delta's "BEST FARE GUARANTEE."

**F.      Plaintiff's Experience**

62.     On August 7, 2013, Plaintiff booked a flight, for herself and her husband, on delta.com for a trip on March 21, 2014 from Appleton, Wisconsin (ATW) to Sarasota, Florida (SRQ), returning on March 28, 2014, with a connecting flight in Delta's hub in Atlanta.

63.     At the time of the booking, delta.com featured, in several locations, Delta's "BEST FARE GUARANTEE," as discussed above.

64.     Based on this "guarantee," which she saw while reviewing the website and making her booking, Plaintiff understood she was getting the best fare Delta had available for the journey when she purchased it on delta.com.

65.     According to her booking confirmation, Plaintiff's outbound fare booked in "L" fare class, with the return fare in "U" fare class, with a corresponding total cost of $549.60 ($506 plus $43.60 in additional taxes and fees) for each person.  Exhibit E.

66.     Archived GDS data accessed by counsel confirms that the published "U" fare on that day was UA00A0NQ at $236 one way, and the published "L" fare was $270 one way—for a total of $506.

67.     While historical fare class availability is not made publicly available,[1] counsel performed research using current inventory in May, 2014 to determine whether Plaintiff's Appleton to Sarasota journey was affected by the "married segment" pricing scheme.

68.     Specifically, counsel recreated various characteristics of Plaintiff's August 7, 2013 search on delta.com, performing a series of searches for identical future flights. Specifically, Plaintiff's tickets were issued 226 days before her and her husband's travel from Appleton was to begin, Plaintiff's trip lasted seven days, and travel in both directions was on a Friday.  Counsel's searches recreated these characteristics, as seat inventory is often affected by features such as particular weekdays (availability in lower fare classes is easier to find on a Tuesday than a Friday) and trip length.

69.     The results of those searches, and corresponding GDS data, are attached as a compendium in Exhibit F.

_____

[1] Unlike tariff data, seat inventory data disappears from *publicly available* sources when the flight takes off.  Upon information and belief, Delta and/or its contractors maintain this information.

70.     Counsel's research indicates that Delta's Appleton to Sarasota routing is affected by the "married segment" pricing scheme.

71.     Specifically, counsel conducted seat inventory searches using expertflyer.com on four different dates, at different times of the day, and for travel on 12 different future dates,[2] all consistent with the parameters discussed above, which mimicked Plaintiff's original search on delta.com.

72.     The results from the searches are shown in the two tables below—one for the outbound ATW-SRQ flights, and one for the return SRQ-ATW flight.  The tables include the search and  travel dates, the flights examined, the lowest available fare class when the flights were "married," the lowest available fare class when the flights were not "married," and the fare difference between the two:

**Outbound: ATW-SRQ**

| Search Date | Travel Date | Flight Number | Lowest Married Fare Class Available on Delta.com | Lowest Fare Class Actually Available on Both Segments | Price Difference Between Married Fare Class and Lowest Fare Class Actually Available on Both Flights | Exhibit Numbers |
|---|---|---|---|---|---|---|
| 5/7/14 | 12/19/14 | 5476 / 1725 | L / $270 | T / $195 | $75 | 9-11 |
| 5/7/14 | 12/19/14 | 5323 / 776 | K / $346 | U / $236 | $110 | 9-11 |
| 5/15/14 | 10/30/14 | 1808 / 1725 | T / $195 | V / $170 | $25 | 27-29 |
| 5/15/14 | 10/30/14 | 5323 / 776 | K / $346 | T / $195 | $151 | 27-29 |
| 5/18/14 | 12/30/14 | 5476 / 1725 | T / $195 | V / $170 | $25 | 30-32 |
| 5/19/14 | 1/17/15 | 1808 / 1725 | T / $195 | V / $170 | $25 | 39-41 |
| 5/7/14 | 12/19/14 | 5476 / 1725 | L / $270 | T / $195 | $75 | 9-11 |

---

[2] Some of those travel dates were approximately 226 days into the future and some were not, in order to show that the practice in question is used throughout the year.

**Return: SRQ-ATW**

| Search Date | Travel Date | Flight Number | Lowest Married Fare Class Available on Delta.com | Lowest Fare Class Actually Available on Both Segments | Price Difference Between Married Fare Class and Lowest Fare Class Actually Available on Both Flights | Exhibit Numbers |
|---|---|---|---|---|---|---|
| 5/7/14 | 12/27/14 | 2298 / 5323 | L / $270 | U / $236 | $34 | 12-14 |
| 5/7/14 | 1/1/15 | 2298 / 5323 | K / $346 | L / $270 | $76 | 15-17 |
| 5/7/14 | 1/2/15 | 2298 / 5323 | K / $346 | L / $270 | $76 | 18-20 |
| 5/15/14 | 11/6/14 | 2298 / 5323 | U / $236 | T / $195 | $41 | 21-23 |
| 5/15/14 | 11/7/14 | 2298 / 5323 | Q / $377 | U / $236 | $141 | 24-26 |
| 5/18/14 | 1/04/15 | 2298 / 5323 | H / $495 | Q / $377 | $118 | 33-35 |
| 5/18/14 | 1/12/15 | 2298 / 5323 | U / $236 | V / $170 | $66 | 36-38 |

73.     In each of the above real-world examples, consumer costs for an Appleton to Sarasota journey would have been significantly cheaper if Delta had not "married" individual segments and had not artificially prohibited access to the lowest fare class available on both segments.  Sometimes, the price difference is $25 each way, and sometimes as much as $151 each way.

74.     The fare class Plaintiff booked for her journey from Appleton to Sarasota was subject to Delta's "married segment" pricing scheme, of which Plaintiff was unaware, just as each example in paragraph 72 was so affected.  Therefore, on the day Plaintiff booked her flight, investigation demonstrates that the individual segments for both the APQ-ATL or ATL-SRS

flights most likely existed in lower fare classes than the ones she was actually provided—"L" or "U," respectively.

75.     Plaintiff, thus, was deprived of the ability to book her journey in a lower fare class, and was forced to book her journey in a higher fare class with a higher corresponding actual fare.

76.     Recourse to Delta's business records, or that of its contractors, is necessary to determine the exact extent of the price differential.

## CLASS ALLEGATIONS

77.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

78.     The proposed classes are defined as follows:

All persons who made a booking on delta.com for a journey with a connecting city, where identical, individual flight segments of that journey both had availability in a lower fare class than the one provided by Delta (the "National Class").

All citizens of the State of Wisconsin who made a booking on delta.com for a journey with a connecting city, where identical, individual flight segments of that journey both had availability in a lower fare class than the one provided by Delta (the "Wisconsin Subclass").

The National Class and the Wisconsin Subclass are collectively referred to as the "Class" or "Classes."

79.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

80.     Excluded from the Classes are Delta, its parents, subsidiaries, affiliates, officers and directors; any entity in which Delta has a controlling interest; all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect

14

of this litigation, as well as their immediate family members.

81.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Delta's records.

82.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged fares higher than the lowest available fares by Delta. The representative Plaintiff, like all Class members, has been damaged by Delta's misconduct in that she overpaid for her Delta airfare. Furthermore, the factual basis of Delta's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

83.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

84.     Among the questions of law and fact common to the Classes are whether Delta:

a.     Refused to sell available seats in lower cost fare class on routes with connecting flights;

b.     Breached its express warranty of a "BEST FARE GUARANTEE;"

c.     Breached its contractual promise to provide a "BEST FARE GUARANTEE;"

d.     Breached its covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its connecting city pricing practices; and

e.     Violated the consumer protection acts of certain states through its connecting city pricing practices.

85.     Other questions of law and fact common to the Classes include:

a.      The proper method or methods by which to measure damages; and

b.      The declaratory relief to which the Classes are entitled.

86.    Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overcharging policies and practices utilized by Delta. Plaintiff has suffered the harm alleged herein and has no interests antagonistic to the interests of any other Class member.

87.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

88.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Delta, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Delta's misconduct will proceed without remedy.

89.    Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the National Class)

90.     Plaintiff repeats paragraphs 1 through 89 above, as though fully set forth herein.

91.     Plaintiff and Delta have contracted for air travel, as embodied in terms expressed on Delta's website, delta.com. and related documentation.

92.     Delta's "BEST FARE GUARANTEE" became an enforceable contract term when Plaintiff booked a ticket on delta.com.

93.     Delta breached that contractual promise when it provided fares based on fare classes other than the available "BEST FARE" to Plaintiff for the trip she booked on August 7, 2013.

94.     Plaintiff and members of the National Class have performed all, or substantially all, of the obligations imposed on them under their contract with Delta.

95.     Despite the full performance by Plaintiff and other Class members, Defendant did not, in fact, provide Plaintiff or other Class members with the "BEST FARES," based on the lowest fare classes, available for the routing they took, which has resulted in harm to Plaintiff and other Class members, who did not receive the benefit of their bargain.

96.     Plaintiff and members of the National Class have sustained damages as a result of Delta's breach of the contract.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of the Wisconsin Class)

97.     Plaintiff repeats paragraphs 1 through 96 above, as though fully set forth herein.

98.     Under the law of the State of Wisconsin, the covenant of good faith and fair dealing is an element of contracts, unless the parties choose to disclaim that covenant.  The parties have not disclaimed that covenant in their contract.

17

99.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract, in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

100.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes its conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

101.    Delta has breached the covenant of good faith and fair dealing through its connecting city fare pricing policies and practices as alleged herein.

102.    Plaintiff and other Class members purchased their Delta tickets on delta.com with the expectation that they were receiving the "BEST FARE" for that particular journey.

103.    Defendant, however, did not provide Plaintiff with the "BEST FARES" available. As such, Plaintiff and other Class members have not obtained the benefit of their bargain from Defendant, and the essential purpose of the contract has been frustrated.

104.    Plaintiff and members of the Wisconsin Subclass have performed all, or substantially all, of the obligations imposed on them.

105.    Plaintiff and members of the Wisconsin Subclass have sustained damages as a result of Delta's breach of the covenant of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF
### Breach of Express Warranty
### (On Behalf of the National Class)

106.    Plaintiff repeats paragraphs 1 through 105 above, as though fully set forth herein.

107.    Delta had and continues to have a duty to abide by any promises it voluntarily and affirmatively makes to users of delta.com.

108.    Delta expressly warranted that it was providing the "BEST FARES" for users of delta.com, when that, in fact, was not true, as described above.

109.    Delta has wrongfully collected excess fare charges from Plaintiff and the members of the National Class.

110.    Delta continues to retain these charges unlawfully and without the consent of Plaintiff or members of the National Class.

111.    Delta intends to permanently deprive Plaintiff and the members of the National Class of these funds.

112.    These funds are properly owned by Plaintiff and the members of the National Class, not Delta, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

113.    Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

114.    Delta has wrongfully converted these specific and readily identifiable funds.

115.    Delta's wrongful conduct is continuing.

116.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

117.    By reason of the foregoing, Plaintiff and the members of the National Class are entitled to recover from Delta all damages and costs permitted by law, including all amounts that

Delta has wrongfully converted.

## FOURTH CLAIM FOR RELIEF
### Fraud
### (On Behalf of the National Class)

118.    Plaintiff incorporates by reference Paragraphs 1 through 117 above, as though fully set forth herein.

119.    Defendant has affirmed as a fact, promised, and described airfares available for purchase on delta.com as the "BEST FARES" possible.  These descriptions, affirmations of fact and/or promises are false and were known to be false when made, and constitute fraud.

120.    The elements of common law fraud include the following:  1) the defendant made a representation of fact to the plaintiff; 2) the representation of fact was false; 3) the plaintiff believed and relied on the misrepresentation to her detriment or damage; 4) the defendant made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the defendant made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to her detriment or damage.

121.    Defendant made material factual representations to Plaintiff and the National Class that airfares purchased on delta.com were the "BEST FARES" possible.

122.    However, that was inaccurate for some flights, for which lower fare class seats existed.

123.    Plaintiff and the National Class justifiably believed and relied on Defendant's fraudulent description of their delta.com airfare when they purchased their air tickets.

124.    Defendant was fully aware that lower fares were available—indeed, Defendant publicly published them on a GDS that indicated this very fact.  Defendant, however, has willfully continued to sell, market, and advertise its delta.com fares as the "BEST FARES."

125.    Defendant's material, false, and fraudulent misrepresentations were intended to deceive consumers into buying their air tickets on delta.com, and to paying a premium price for them.  Defendant deliberately led Plaintiff and the National Class to believe the falsity that the tickets they were purchasing were truly the "BEST FARES" available.

126.    Defendant's fraudulent conduct damaged Plaintiff and the National Class. Plaintiff and the National Class were deceived into buying and paying for airfare that was not the lowest price available.

127.    Plaintiff and the National Class have suffered monetary and such other and further damages as may be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.      For all legal and equitable remedies available under the Wisconsin law;

2.      Restitution of all monies wrongfully charged, as a result of the wrongs alleged herein, in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by Delta from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated: August 7, 2014

<div style="margin-left:40%">

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

s/James C. Shah
James C. Shah (Bar No. 1083846)
735 North Water Street, Suite 1222
Milwaukee, WI 53202
Telephone: (414) 226-9900
Facsimile: (866) 300-7367
jshah@sfmslaw.com

Hassan A. Zavareei (*pro hac vice to be filed*)
Jeffrey Kaliel (*pro hac vice to be filed*)
**TYCKO & ZAVAREEI LLP**
2000 L Street, N. W., Suite 808
Washington D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

*Counsel for Plaintiff and the Proposed Classes*

</div>